Filed 8/7/15  In re O.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re O.B. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>E.B.,<br><br>     Defendant and Appellant. | E062137<br><br>(Super.Ct.No. SWJ1400382)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  John M. Monterosso, Judge.  Affirmed.

Christina Garbrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Guy B. Pittman, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and Appellant E.B. (mother) appeals from a judgment declaring her three children dependents of the juvenile court under Welfare and Institutions Code section 300, subdivision (b),[1] and removing the children from her custody. Some of the jurisdictional allegations the court sustained pertained solely to father and some pertained solely to mother. The court provided reunification services to both parents. It ordered mother to submit to hair follicle and random drug testing as well as a psychological evaluation.

On appeal, mother contends that there was insufficient evidence to support the jurisdictional findings against her or the dispositional order removing the children from her custody.[2] We affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Mother and father have three young children, O.B., six years old, A.B., three years old, and B.B., two years old. Father has an extensive criminal record involving various controlled substances and is addicted to heroin. Mother and father are separated; mother filed for divorce in April 2013 because father was using drugs and "she felt she could not

---

[1] All further statutory references are to this code.

[2] Mother does not challenge the findings or orders against father.

trust him around the children." Prior to detention, the children had been living with mother.

Despite knowing about father's drug abuse, mother allowed him to act as the primary caretaker while she attended school to become a dental hygienist. The children came to the attention of Plaintiff and Respondent Riverside County Department of Public Social Services (DPSS or the Department) in April 2014, when the police found mother's two youngest children, A.B. and B.B., naked and unsupervised at father's home while father was unconscious from a heroin overdose.

A. *Father's Arrest and the Initial Detention*

On April 9, 2014, father had a birthday party for O.B. at his house. Mother and the children slept over at his house that evening. The next morning, mother left A.B and B.B. in father's care, so that she could take O.B. to school and attend her dental hygiene classes.

As soon as she drove off father's street, the police stopped her. They were about to execute a warrant to search father's house for drugs and counterfeit currency, and they asked mother questions about what was going on at the home when she left.

When the police arrived at father's house, A.B. and B.B. answered the door. Both children were naked and father was on the couch, unconscious from a heroin overdose. The police found a heroin pipe in his pocket, about a dozen hypodermic needles on the floor within the children's reach, and other narcotics paraphernalia. The home was filthy

3

and appeared to be in the process of being remodeled. There were soiled diapers and trash in the hallways. The children had access to the pool because the sliding door to the backyard and the pool's gated doorway were open. The police arrested father and two other adult males who were also in the house and who had extensive criminal histories.

Mother told the police that she was unaware of father's drug use, criminal activities, and the presence of other adults in his house. The police released the three children to mother, and arrested father for child endangerment, being under the influence, and counterfeiting.

On April 22, 2014, a DPSS social worker interviewed mother and her children at mother's home. The home was clean and safe, and mother appeared "lucid, cooperative and concerned." Mother informed the social worker that she was a full-time student in a dental hygiene program and that she had no history of alcohol or drug abuse.

The social worker had searched the parents' criminal and court history before the interview and asked mother why she had sought a restraining order against father in June 2013. Mother responded that father had been aggressive toward someone she was dating. She said that father had been verbally abusive towards her in the past and had been physically abusive once, but that all of these incidents occurred before the children were born. She denied any other domestic violence incidents.

She also denied knowing anything about father's recent arrest and said she had no idea he was using drugs the day she left A.B. and B.B. at his house. She said that his home was disheveled because it was being remodeled and she denied that his home was hazardous to children. She told the social worker she had no idea father's roommates were at the house that morning; however, the paternal grandfather later informed the social worker that he had read the police report of father's arrest and mother had told the police that there was another adult male in the house when she left.

Mother told the social worker that she had initiated divorce proceedings in April 2013 because father began using drugs and went to rehab for "prescription medications and opiate abuse." She filed for divorce when he went to rehab because "she felt like she could not trust him around the children." The family law court had issued an order authorizing her to test father for drugs at her own discretion before allowing him to visit with the children. She said that under the current court order, father was allowed to have supervised visits with the children every other weekend at the paternal grandparents' home. However, she admitted that on occasion she allowed father to care for the children while she was at school. When the social worker interviewed father, he reported that he watched the children five days a week, from 7:00 a.m. to 6:00 p.m., while mother was at school.

During her interview, six-year-old O.B. told the social worker that she saw a "white and brown" pipe on father's kitchen counter. To get more detail about the pipe,

5

the social worker showed O.B. various photographs of pipes and O.B. selected a methamphetamine pipe. O.B. also told the social worker that father "mak[es] money with paint, in the kitchen" and tells her not to come into the kitchen because he does "not want me to see this." When they slept over at his house, sometimes her younger sister A.B. snuck out of the house when father was asleep.

O.B. described instances where father would come over to mother's house and break things. She recalled seeing an incident of physical domestic violence between her parents and remembers being "scared because of [a] crash and something broke."

A.B. told the social worker that father had a "poking thing" and that he "did a poking thing on his arm."

After the interviews, the social worker discussed the case with her supervisor. At that point, based on the social worker's interview with the mother and the home assessment, they "felt the mother would keep the children safe." The social worker gave mother a safety plan, according to which, mother was not to allow father any contact with the children. She told mother that she was concerned mother may not be able to determine whether father was using drugs. Mother signed the safety plan, and agreed that the children were to remain in her care.

On April 29, 2014, the social worker told mother that father could not see the children until he took a drug test. On May 1, she informed mother that father failed to take a drug test and was therefore not allowed to see the children.

6

On May 5, the social worker interviewed O.B. at school. O.B. stated that father had spent the night at mother's house the night before. She said, "I slept with my mommy on one side and my daddy on the other and I was in the middle of the bed." A.B. and B.B. had stayed with the paternal grandparents that night. O.B. said that father was at the house when she left for school that morning. The social worker also spoke with B.B. He told her that he had seen father at mother's house since the last time he had seen the social worker (i.e., since the day mother signed the safety plan). Both mother and father denied that father had any contact with the children since his arrest.

That same day, DPSS took the children into protective custody and placed them with the paternal grandparents. On May 8, 2014, the trial court found that DPSS had made a prima facie showing that the children came within section 300, subdivision (b). DPSS detained the children, and they remained placed with the paternal grandparents.

B. *The Dependency Petition*

DPSS's jurisdiction and disposition report indicated that father had an extensive criminal history involving alcohol and controlled substances. It also contained information from police reports indicating that mother had been present for one of father's drug-related arrests. Specifically, in November 2013, mother was at father's home when police found about 80 marijuana plants in his garage and "a brown tar-like substance resembling heroin and a digital pocket scale" inside the house.

7

On May 13, 2014, the social worker attempted to interview mother, but mother was angry and would not speak with her alone. Mother also refused to take a saliva drug test.

The social worker interviewed the paternal grandparents. They reported that mother knew father was using drugs and engaging in criminal activity and nevertheless allowed him to act as the children's full-time caregiver while she was at school. The paternal grandfather said that mother allowed father to spend the night in her home and take O.B. to school. He also reported, and father later confirmed, that mother was hospitalized in December 2013 for a heroin overdose. He told the social worker that he believed mother also had issues with drug use. The paternal grandparents had stated in a declaration filed in the marriage dissolution proceeding that they believed that in 2004 mother took methamphetamine and ecstasy and abused alcohol.

On May 20, 2014, mother tested positive for amphetamines and methamphetamines. On May 30, she tested negative. Thereafter, mother either refused to take DPSS's drug tests or failed to show up for scheduled tests. Citing her positive drug test, her refusal to submit to additional drug tests, and her impaired judgment (as demonstrated by her inability to recognize the risks of leaving the children in father's care), the Department expressed concern that mother was abusing drugs.

On September 9, 2014, DPSS filed the operative dependency petition, which alleged that the children fell under section 300, subdivision (b), and were at risk of future physical or emotional harm because: (1) father abused controlled substances (allegation b-1); (2) father neglected the children by leaving them unsupervised in his home, which contained various hazardous conditions, such as hypodermic needles within reach of the children (allegation b-2); (3) mother left the children in father's care when she knew or reasonably should have known that he abused drugs and engaged in criminal activity (allegation b-4); (4) mother allowed father to spend the night in the children's home in violation of the safety plan (allegation b-5); (5) mother had a history of abusing controlled substances and was at risk of relapse because she continued to maintain a relationship with father who actively abused drugs (allegation b-6); and (6) mother and father continued to spend the night in one another's homes when they had an extensive history of domestic violence (allegation b-7).[3]

C. *The Jurisdiction and Disposition Hearing*

The court heard testimony from father, mother, and the social worker at the contested jurisdiction and disposition hearing that took place on September 9, 10, and 11, 2014. Father testified that in the past year he babysat the children on a weekly basis

---

[3] At the jurisdiction and disposition hearing, father waived his right to trial and submitted on the evidence. The court found true the allegations against him, and these allegations are not at issue on appeal. DPSS struck allegation b-3 from the petition.

while mother was at school. He denied having slept over at mother's house on May 4, 2014, but he admitted that he spent the night with mother and the children at his parents' house at some point during the last 30 days.

Father also admitted that he had sought a restraining order against mother in 2013. He had stated in his supporting declaration that mother was a prescription drug addict and was under the influence of drugs and alcohol when she physically assaulted him on July 27, 2013. He claimed that the statements in his declaration were not true and that he had only filed it because he was dating another woman at the time and did not want mother to "ruin [his] new relationship."

When asked about mother's hospitalization in December 2013, father denied that the reason for the hospitalization was an opiate overdose. He testified that he had taken mother to the hospital that day for a dizzy spell.

Mother testified that the first time she became aware of father's drug problem was at the end of 2012. However, when presented with the request for a restraining order that she had filed in June 2013, she admitted that she knew he suffered from drug abuse issues since 1997. In her supporting declaration, mother had stated that father "has an extensive drug and alcohol abuse history and has a domestic violence history." She stated that from 1997 to 2006, he had been "in and out of drug rehab and jail . . . for drug/alcohol related offenses." Her declaration recounted several occasions in 2012 and 2013 when he had overdosed on heroin and had to be hospitalized. She stated that "[i]n March 2013 he told

10

me that he had been using meth and heroin since September 2012 and cannot stop." She also testified that she was aware he had been in several car accidents as a result of driving under the influence.

Mother testified that she had been authorized by the family law court to test father for drugs. Initially, these tests were performed randomly at a specified testing site; however, over time she agreed to test father on scheduled days using "home kits." She testified that she could tell when father was not sober and that she would never leave the children in his care when he was under the influence. She admitted there was a period of time when he would watch the kids "every day" while she was at school.

She testified that she felt it was safe to leave the children with father on the morning of his arrest (April 10, 2014) because he did not appear to be under the influence at that time. She denied having seen any drugs or drug paraphernalia in his home that morning. She did not believe O.B. had actually told the social worker that she had seen drug paraphernalia in father's home or that she had witnessed father yelling at mother and breaking things in her house.

When asked about the December 2013 hospitalization, she stated that father had slipped her a pill that day. According to mother, father was at her house and she was complaining about having a headache. He offered her a white, unmarked pill. She did not know what it was but she took it because she thought it looked like it came from a "pill bottle." After a while, she began to feel dizzy and clammy. She remembered being

11

at the hospital for a little bit and then waking up three days later in her home. She later learned that she had been diagnosed with an opiate overdose, but she did not confront father about the pill because she did not want to "escalate [the] situation." She admitted that she allowed father to babysit the children after this incident and that she never told the social worker that she believed father had drugged her.

Mother acknowledged receipt of the safety plan and testified that she knew the consequences of violating it "would be huge." Mother denied that father slept in her home on May 4, 2014. She believed that O.B. had made the story up because she wanted her parents to reunite.

Mother testified that she had never taken illegal drugs. When asked about having tested positive for methamphetamine, she opined that the result was probably caused by the fact that she was taking Wellbutrin for depression and Propranolol for tremors. She admitted that she had refused to tell the social worker about any other medication she was taking aside from Adderall.

Regarding domestic violence, mother attempted to downplay the incidents between her and father. She testified that father had assaulted her on occasion, but before the children were born. However, when again confronted with her June 2013 request for a restraining order, she admitted that her declaration was truthful. In it, she stated that on June 16, 2013, father had arrived late at her house for a visit with the children and physically assaulted her. She alleged that father had pulled out a knife and threatened to

12

stab her with it. He stabbed the wall and yelled that he was going to "fucking kill [her]." He ran to the children and asked them if they wanted to leave with him. She alleged that "[h]e did not ca[r]e that the children were horrified and scared out of their minds." Mother also admitted during her testimony that, in October 2012, father assaulted and choked her while the children were present in the home.

The social worker testified that mother had not been forthcoming about father's history of drug abuse and domestic violence, and that she had minimized the amount of time she was allowing father to care for the children. The Department did not believe it was safe to return the children to mother's care at that time because it did not have enough evidence of clean drug tests (due to mother's refusal to participate in DPSS's tests) or participation in counseling and parenting classes.

D. *The Court's Findings and Ruling*

At the close of evidence, the trial court found that "[mother's] credibility is nonexistent." It stated, "I don't think I've ever seen a situation unravel so poorly for a parent when simple compliance could have easily addressed that issue and those concerns."

The court found that mother allowed father to care for the children despite knowing that he suffered from a serious drug addiction for which he was not even attempting to seek help. It observed that "[a]ny reasonable person . . . would know that one doesn't quit a chronic heroin addiction overnight. It requires extensive treatment,

13

which father never sought." The court found it "beyond [its] comprehension" that mother would allow father to spend any time with the children, let alone the significant amount to which she had admitted.

The court also found that the relationship between father and mother was "clearly . . . highlighted by turmoil and domestic violence" and that nevertheless mother continued to sleep in the same home as father. It believed O.B.'s version of the May 4, 2014, sleep-over incident and discredited mother's and father's denials. It also disbelieved mother's story about her opiate overdose hospitalization, finding that it defied common sense that such a severe reaction could be caused by a single pill. In the alternative, it found that if mother's story were true, her decision to leave the children in father's care after that incident was even more inappropriate than it already was considering his drug use and illegal activity.

Based on its findings, the court sustained all of the allegations against mother. It stated that even though the incidents discussed at the hearing had happened in the past, it could "easily find by these circumstances that there is still a substantial risk to the children" because mother had "failed to address any of [the] issues" that DPSS was concerned about. It stated that it had "no confidence whatsoever that [mother] would follow any reasonable directives to assure the safety of the children."

The court removed the children from mother's custody and ordered family reunification services. It directed mother to submit to hair follicle testing, random drug testing, and a psychological exam.

II

ANALYSIS

A. *Substantial Evidence Supports the Court's Jurisdictional Findings Against Mother*

Mother argues that there is insufficient evidence to support dependency jurisdiction over the children based on her conduct. She acknowledges that dependency jurisdiction over the children is proper based on father's conduct, but she asks that we exercise our discretion to review the specific jurisdictional findings against her (i.e., allegations b-4 through b-7) because they could have practical and legal impacts on her outside of the issue of dependency jurisdiction.

Because the validity of the jurisdictional findings against mother "is the difference between [her] being an 'offending' parent versus a 'non-offending' parent," a distinction that could affect her in future dependency or family law proceedings, we grant her request for review. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.) However, based on our review, we conclude that substantial evidence supports each of the four sustained allegations against her.

15

When reviewing a challenge to the sufficiency of the evidence supporting a juvenile court's jurisdictional findings, "we determine if substantial evidence, contradicted or uncontradicted, supports them." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We consider the record as a whole, resolving all conflicts and drawing all reasonable inferences in support of the jurisdictional findings. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103.) " 'We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts.' " (*Ibid.*) Thus, in order to succeed on appeal, mother must demonstrate that there is no evidence of a sufficiently substantial nature to support the juvenile court's jurisdictional findings. (*Ibid*.)

The purpose of section 300 is to provide maximum safety and protection for children who are at risk of being physically or emotionally abused or neglected and "to ensure [their] safety, protection, and physical and emotional well-being." (§ 300.2; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215.) In order to make a dependency finding, the juvenile court must find by a preponderance of evidence that the following three elements are met: "(1) neglectful conduct or substance abuse by a parent in one of the specified forms, (2) causation, and (3) serious physical harm to the child, or a substantial risk of such harm." (*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 724-725.)

16

1. *Allegations b-4 and b-5: Allowing father, a known drug abuser, to care for the children*

Allegations b-4 and b-5 are related; they both allege that mother neglected the children's health, safety, and well-being by allowing father to care for and be around the children despite knowing he posed a danger due to his drug addiction.[4] There is substantial evidence in the record to support these allegations. The record demonstrates that mother was aware that father suffers from a serious drug addiction, that she was incapable of appreciating the risks this addiction poses to the children, and that she was unwilling to follow the procedures DPSS put in place to minimize those risks.

On the day she left her two infant children in father's care, he was found unconscious, under the influence of heroin. The children were found unclothed and unsupervised, with several hypodermic needles within their reach and open access to a pool. Had the police not arrived when they did, there is no telling what sort of harm the children could have suffered.

Mother contends that there was no evidence that she knew or should have known that father was under the influence of any drug when she left A.B. and B.B. in his care

---

[4] Specifically, allegation b-4 states: "The mother neglects the health, safety, and well[-]being of the children in that she knew, or reasonably should have known that the father abuses controlled substances and engages in criminal activity and the mother left the children in the care of father." Allegation b-5 states: "The mother neglects the health, safety, and well[-]being of the children in that she failed to abide by the Safety Plan and allowed the father to spend the night in the children's home."

that day.  We disagree.  The evidence supports a finding that mother should have known father was using heroin on the day of his arrest, or at the very least, was not to be trusted to care for the children based on his extensive history of drug abuse.

O.B., who left the house with mother on the morning of father's arrest, told the social worker that she had seen a methamphetamine pipe on his kitchen counter. Additionally, the police found several hypodermic needles when they arrived at his home minutes after mother had left with O.B.  A reasonable trier of fact could infer from this evidence that mother had seen at least some of this drug paraphernalia in father's house.

In any event, even if mother truly had no idea father was using heroin on that particular day, she certainly knew that he was actively abusing drugs at that time. Father's drug abuse is the reason she filed for a divorce a year earlier and the reason the family law court had authorized her to drug test him before his supervised visits with the children.

Moreover, she knew about specific incidents that demonstrated father was unfit to watch the children alone.  Her request for a restraining order from June 2013 alleges that he had overdosed on heroin several times in 2012 and 2013, and that in 2013 he had admitted to her that he was unable to stop using methamphetamine and heroin.  She was present in November 2013 when police found a large amount of marijuana plants in his garage and a substance that appeared to be heroin in his house.  She also admitted that she knew father had been in car accidents as a result of driving under the influence.  And,

18

if her story about why she was hospitalized in December 2013 is to be believed, then she left her two infants in the care of a man who drugged her against her consent.

What is more, mother continued to allow father to be around her children after his arrest and after signing the safety plan. O.B. told the social worker that father had spent the night at mother's house on May 4, 2014, and father testified that he had spent the night with mother and the children at his parents' house shortly before the jurisdiction and disposition hearing. B.B. also told the social worker that he had seen father since his arrest. He could have been referring to one of these two incidents, or a third incident.

Based on this evidence, a reasonable trier of fact could find that mother reasonably should have known that leaving her two infant children in father's unsupervised care would place them at a substantial risk of harm.

Mother contends that the children were not at risk at the time of the jurisdictional hearing because there was no indication that she would violate court orders and allow father to contact the children *going forward*. Her actions in this case indicate otherwise. The record here contains evidence that would allow a reasonable trier of fact to conclude that she was uncooperative with DPSS and was incapable of appreciating the risk father poses to the children. During her first interview, she failed to inform the social worker about the extent of father's drug addiction and she minimized the amount of time he spent with the children. Specifically, she told the social worker that father's issues with drugs began in 2013 despite knowing that he had suffered with a serious drug addiction

19

for nearly two decades. She also told the social worker that father occasionally watched the children while she was at school, when both father and the paternal grandfather reported that father was the children's primary caretaker while mother was at school. A reasonable trier of fact could view mother's statements to the social worker as less than forthcoming, at best; at worst, dishonest. Moreover, mother violated the safety plan at least twice. Her actions in this case support a reasonable inference that court intervention was needed to protect the children from father.

2. *Allegation b-6: Risk of relapse*

The trial court sustained the Department's allegation that mother placed the children at a substantial risk of harm because she risked her own relapse into substance abuse by maintaining a relationship with a drug addict. Based on the evidence presented during the hearing, a reasonable trier of fact could conclude that mother had been hospitalized for a heroin overdose in December 2013 and had tested positive for methamphetamine on May 20, 2014. Additionally, the grandparents believed mother had used methamphetamine and ecstasy in the past and had struggled with alcohol abuse. This evidence of a history of drug use, coupled with evidence that mother continued to maintain a relationship with father and allow him to be around the children, even after DPSS told her that in order to protect the children she must not allow contact, supports the allegation. In other words, the trial court reasonably found that mother had used drugs and was at risk of using, because she continued to spend time with a person who

20

was actively abusing drugs and who, according to mother, had drugged her less than a year earlier.

Mother argues that the December 2013 hospitalization was not an incident of substance abuse because father had drugged her without her knowledge. However, the court was not required to believe her explanation for the opiate overdose. (*In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1217 [where the mother tested positive for methamphetamine and admitted to using the drug in the past, trial court "reasonably disbelieved [the mother's] portrayal of limited, sporadic drug use"].) Under a substantial evidence review, we look for evidence to reasonably support the court's finding, we do not reassess the weight of that evidence. (*In re Lana S.*, *supra*, 207 Cal.App.4th at p. 103.)

Mother's explanations as to why she tested positive for methamphetamine in May 2014 are similarly unpersuasive in a substantial evidence review. At the hearing, she claimed the positive test was a result of taking Wellbutrin and Propranolol. On appeal, she contends (for the first time and citing evidence not before the trial court) that it was a result of taking Adderall. Not only was the court authorized to disbelieve mother's explanations, but also the evidence before the court was that Adderall would not have provided a positive result for methamphetamine. (See *People v. Dowl* (2013) 57 Cal.4th 1079, 1092 [a trier of fact is free to reject testimony as unbelievable].)

21

Mother contends that the "mere usage of drugs, even *hard drugs*" is not a basis for dependency jurisdiction without a causal link to risk of harm. She is incorrect. When children are very young, as the children in this case are, the use of illegal drugs "is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm."[5] (*In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1219, citing *In re Drake M.*, *supra*, 211 Cal.App.4th at p. 767.) In any event, there is evidence to support a finding that mother's use of drugs placed the children at risk of harm. The Department stated in its reports and at the hearing that it was concerned that her drug use was impairing her ability to perceive the risks that father posed to the children. Her inability to perceive those risks is what prevented her from keeping the children away from father.

Lastly, we reject mother's various arguments as to why the evidence failed to establish that she engaged in drug *abuse*, as opposed to mere use. These arguments miss the point of the Department's allegation. The b-6 allegation did not allege that mother was a drug abuser, it alleged that she had a history of drug use and was at risk of relapsing due to the nature of her interaction with father. Thus, the Department was not required to produce evidence of drug abuse on her part in order to support the allegation. The record contains evidence that mother was using illegal drugs and was at risk of

---

[5] Children under six years old are considered very young for purposes of the harm that drug abuse poses. (*In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1219.)

22

continuing to use them due to her relationship with father.  This is substantial evidence to support the court's b-6 finding.

### 3. *Allegation b-7: Domestic violence*

Allegation b-7 states that the parents neglected the health, safety, and well-being of the children by continuing to spend the night in the same home despite having "an extensive history of exposing the children to acts of domestic violence . . . [and of filing] restraining orders against each other."  A finding of domestic violence "in the same household where children are living *is* neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it."  (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194.)  A child "could wander into the room where it was occurring and be accidentally [harmed]."  (*In re E.B.* (2010) 184 Cal.App.4th 568, 576.)

Here, the record contains substantial evidence to support a finding that mother and father engaged in domestic violence in the presence of the children.  According to O.B., father sometimes came over to mother's home and broke things when she was trying to sleep.  O.B. reported that she was afraid during one of these incidents because she heard a "crash" and "something broke."  Additionally, the record contains evidence that the children were "scared out of their minds" when father arrived at mother's house in June 2013 and threatened to kill her with a knife.  Mother also admitted that the children were

present in October 2012 when father pushed her down the stairs and choked her to the point where she almost lost consciousness.

Mother argues that these incidents of domestic violence were "isolated and [in the] past" and thus are insufficient to support the b-7 allegation. First, we disagree with her characterization of the incidents as isolated. The record contains requests for restraining orders filed by both parents wherein each parent alleges that the other routinely engages in abusive behavior. These filings alone support the court's finding that the relationship between father and mother was "clearly . . . highlighted by turmoil and domestic violence." Second, the record also reflects that mother and father spent the night in the same house at least three times since mother filed for divorce in April 2013. Two of those incidents occurred after DPSS informed mother that it was imperative for the children's safety that father not be allowed any contact with them.

Mother argues that the court's finding was in error because she had taken remedial measures to ensure that she would no longer be the victim of father's abuse. She asserts that she had participated in domestic violence classes and was in school to become a dental hygienist. As important as such remedial measures may be, the crucial point here is that mother continued to put herself and her children in father's presence, despite knowing his propensity to become violent towards her in front of the children.

24

B. *Disposition*

Mother argues that there was insufficient evidence to support the court's dispositional order removing the children from her custody. She asserts that the children would have remained safe in her care. Again, we disagree.

"Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135, citing § 361, subd. (c)(1).) "The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home." (*In re T.V.*, *supra*, at p. 135.) The minor need not have been actually harmed before removal is appropriate. (*Id.* at pp. 135-136.) "The focus of the statute is on averting harm to the child." (*Id.* at p. 136.) We review a court's dispositional order for substantial evidence. (*Ibid.*)

The same evidence that supported jurisdiction also supported removing the children from mother's custody. The record demonstrates that mother allowed father to care for the children even though she knew he had a severe drug addiction and a history of domestic violence. Moreover, even after father used heroin in his two youngest children's presence and left drug paraphernalia in their reach, and even after DPPS warned her of the risk that father posed through the creation of the safety plan, she still allowed father to be around the children. Given mother's unwillingness to keep the

25

children from father and her refusal to cooperate with DPSS's safety recommendations, we conclude that there is substantial evidence to support a reasonable finding that removing the children from her care was the only means of protecting them from the serious risk of physical harm that father posed.

## III

## DISPOSITION

The jurisdiction judgment and disposition order appealed from are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

26